## Richmond

WALTER W. STOUT, III, VIRGINIA ADMINISTRATOR, ETC.

v.

MARIO ONORATI, T/A, ETC., ET AL.

Record No. 780702.

MOBILITY, INC.

v.

MARIO ONORATI, T/A, ETC., ET AL.

Record No. 780714.

June 6, 1980.

Present: All the Justices.

*Walter W. Stout, III* (*Thomas L. Dettelbach; Shaia, Stout & Markow, P.C.; Kahn, Kleinman, Yanowitz & Arnson,* on brief), for appellant. (Record No. 780702).

*William R. Cogar* (*Stephen W. Brewer; Mays, Valentine, Davenport & Moore,* on briefs), for appellant. (Record No. 780714).

*Rufus G. Coldwell, Jr.* (*William R. Allcott, Jr.; Browder, Russell, Little, Morris & Butcher,* on brief), for appellees. (Records Nos. 780702 and 780714).

COMPTON, J., delivered the opinion of the Court.

In this appeal of a wrongful death action, the sole issue we decide is whether two of the defendants were "other parties" within the mean-

ing of the Virginia Workmen's Compensation Law. We conclude they were not and affirm.

Appellant Walter W. Stout, III, Virginia Administrator for the Estate of Thomas C. Halligan, deceased, filed this suit in September of 1976 against appellant Mobility, Inc., appellee Mario Onorati, trading as Moose's Quality Tractor Parts, and appellee Freddie L. Davis. The plaintiff sought recovery in damages on grounds of negligence and breach of warranty in connection with the death of Halligan which occurred in the City of Richmond on September 18, 1974. Moose's and Davis filed a special plea asserting the trial court was without jurisdiction to hear the case as to them because the exclusive rights and remedies of plaintiff's decedent and his beneficiaries were covered by applicable workmen's compensation statutes.

Following an *ore tenus* hearing and the taking of a *de bene esse* deposition in June of 1977, the trial court sustained the special plea and in February of 1978 entered an order dismissing the action as to Moose's and Davis. Halligan's administrator and Mobility filed separate petitions for appeal which we granted and consolidated for hearing, limiting consideration of the Halligan appeal to the same two issues raised by Mobility.

There are several conflicts and inconsistencies in the evidence. In addition, diverse conclusions of fact may be drawn from portions of the testimony. Under familiar principles, we will recite the facts in the light most favorable to the parties prevailing below.

Mobility was a Minnesota corporation engaged in the manufacture of heavy construction equipment such as front-end loaders and spreaders. Fleming Manufacturing Co. was also a Minnesota corporation, operating as a private carrier of goods and engaged in transporting equipment for Mobility and others. Halligan was a truck driver employed by Fleming.

Moose's was a Virginia business located in Richmond engaged in buying secondhand pieces of farm equipment for the purpose of salvaging and reselling their usable parts; it was also engaged in storing products manufactured by Mobility. As a part of the latter activity, Moose's aided in unloading those items upon delivery by Fleming. Moose's premises covered approximately two acres and included several buildings used "for warehousing of parts" and "a couple of sheds" employed for storage of equipment.

Several years before the accident in question, Moose's had verbally contracted "to unload, help unload, and store [Mobility's] equipment" in its Richmond sheds to be later released to Mobility salesmen or customers. The owner of Moose's testified that because of the space

available at his business location, he had "all kinds of ways to make a dollar." He said, "If the people come to me and want to store equipment, I will store it for a certain amount of dollars." The charge to perform these functions for Mobility was $25 for each piece of equipment, and Moose's unloaded and stored approximately 20 pieces of Mobility's equipment annually. Davis was employed by Moose's.

Halligan was under contract with Fleming as an "over the road" truck driver. Pursuant to this agreement, Halligan was also obligated to "help unload" his cargo for which he was paid extra compensation. The evidence showed that Moose's employees routinely assisted Fleming drivers in unloading the equipment and relied on the drivers to help, because "they loaded it, and, so, they knew how to unload [the freight]."

On the day in question, Halligan had driven a Fleming tractor-trailer unit from Minnesota to Virginia loaded with five pieces of heavy equipment, including a Mobility front-end loader called a "Big Dipper." Because the small size of Moose's loading dock would not accommodate the larger Fleming trucks, it was necessary to transfer the equipment to be stored at Moose's from the Fleming trailer onto a Moose's truck to be then unloaded at Moose's loading dock.

Just prior to the accident, the unloading of one Big Dipper and two spreaders had commenced. Davis backed Moose's truck perpendicular to the side of Fleming's trailer forming a "T." Halligan unchained the load. Davis mounted the Big Dipper and drove it forward off the Fleming truck and onto Moose's vehicle. The four wheels of the Big Dipper moved over the bed of Moose's truck. The two front wheels of the Big Dipper were touching Moose's vehicle but the rear two wheels were not because the counterweight at the rear of the equipment "hung up" on the Fleming vehicle.

Then Halligan and Davis, using a jack, raised the Big Dipper until it was free of Fleming's truck and both assisted in placing "some boards" beneath the rear wheels. Halligan then drove Moose's truck about five feet forward with Davis on the Big Dipper applying its brakes to hold it in place. Halligan then alighted from the truck to secure the chains on two Big Dippers that were to remain on the Fleming truck.

While Halligan was performing that task, Davis jacked the Big Dipper on Moose's truck up enough to free it of the boards and allowed it to settle to the bed of the truck. At that time, the Big Dipper rolled "or whatever" from the back of Moose's truck onto Halligan, killing him instantly.

The survivors of Halligan, a resident of Minnesota, have recovered

workmen's compensation benefits from Fleming under the Minnesota Workmen's Compensation Act.

In a letter opinion sustaining the special plea, the trial judge, applying Virginia law, found:

> The decedent was required to assist in the unloading of Mobility's equipment at the defendant [Moose's] Quality Tractor Parts. The defendant Freddie L. Davis, an employee of [Moose's], was paid to assist in the unloading of Mobility equipment. The decedent, Davis and [Moose's], under the facts, were, at the time of the decedent's death, all engaged in the trade, business or occupation of each other and none were "other parties" within the meaning and intendment of the Virginia Workmen's Compensation Act.

In addition, the trial judge rejected plaintiff's contention that under prevailing conflicts of laws principles, the substantive law of Minnesota and not Virginia should be applied in determining the issues raised by the special plea. That ruling was the subject of the other assignment of error made by both plaintiff and Mobility upon which we granted the appeals. But on brief and during oral argument, Mobility, Moose's and Davis all represented that it is "immaterial" which law applies here because the "same ultimate result is reached under Virginia or Minnesota law." The plaintiff does not dispute these representations. Consequently, in view of the concession, we do not reach the conflicts question and we shall apply Virginia law, as if the plaintiff's benefits had been paid under the Virginia Workmen's Compensation Act (the Act).

Under Code § 65.1-40, the rights and remedies granted by the Act to an employee, on account of personal injury or death by accident, exclude all other rights and remedies of such employee, or his personal representative, at common law or otherwise. But under Code § 65.1-41, such employee, or his personal representative, is authorized to maintain an action at law against the tortfeasor provided the wrongdoer is an "other party" within the meaning of § 65.1-41.

Consequently, while the broad question here is whether Moose's and Davis were "other parties," the litigants say the precise issue is whether at the time of the accident Halligan was performing work on behalf of his employer, Fleming, that was part of the trade, business or occupation of Davis' employer, Moose's. *See Bosher* v. *Jamerson*, 207 Va. 539, 542, 151 S.E.2d 375, 377 (1966); *Floyd* v. *Mitchell*, 203 Va. 269, 274, 123 S.E.2d 369, 372 (1962). Stated differently, defendants Davis and Moose's were "other parties" if at the time of

the accident, Halligan was not performing work that was part of Moose's trade, business or occupation. *Burroughs* v. *Walmont, Inc.,* 210 Va. 98, 99, 168 S.E.2d 107, 108 (1969). If Halligan was not so performing, the trial court erred; if he was so engaged, the court was correct.

■ Plaintiff argues the evidence demonstrates the unloading here was not part of Moose's trade, business or occupation but was merely "transitional contact between Fleming and Moose's." He further contends that "the principal business" of Moose's is the sale of used parts and the repair of tractors and that storing of equipment by Moose's was a mere "accommodation to Mobility and a way of adding some minor revenues to Moose's business." Relying on *Burroughs,* plaintiff next urges, somewhat inconsistently, that Moose's business "is the storage of equipment" in addition to the sale and repair of tractors and tractor parts. He then says that while this "storage" was the "principal purpose of the business relationship" between Mobility and Moose's, "[u]nloading was only incidental to the storage." Plaintiff argues that, in effect, Mobility hired two independent contractors, each a stranger to the other, to accomplish the distribution of its products and there occurred merely "incidental contact of deliverer and recipient" between Fleming and Moose's. He contends that these contacts are on the "periphery" of Moose's trade, business and occupation and should not form the basis for denying plaintiff's common-law claim against third parties.

In a similar vein, Mobility argues that the trial court erred because under its holding, "the ordinary or normal business activities of the independent contractors are totally ignored, and a mere finding that they mutually cooperated in any transaction is sufficient to establish that they are not 'other parties.' " Mobility also says the "unloading activity was simply not a part of Moose's ordinary trade or business of selling used tractor parts." It contends that unloading was clearly part of Fleming's business and that "[a]ny cooperation in unloading Big Dippers extended by Fleming to Moose's only incidentally aided Moose's in performing its limited obligation to Mobility of temporarily storing machines like the Big Dipper."

Also relying on *Burroughs,* Mobility urges that "Halligan never became involved in the ordinary trade or business of Moose's but merely completed the final act of delivery by attempting to unload the Big Dipper at Moose's yard." At the bar, Mobility argued that neither Halligan nor Davis was engaged in the business of the other; for one "fleeting moment" when the vehicles were being unloaded,

it was said, employees who were on the scene together merely came into contact.

We do not agree with the contentions of plaintiff or Mobility. Their argument is based on an erroneous view of the evidence.

The effect of the trial court's finding is that Moose's was in the business of unloading and storing Mobility's equipment and that Halligan, required by his employer to aid in the unloading process, was engaged in such act of unloading the cargo when he was killed. The evidence amply supports those conclusions.

The owner of Moose's had contracted with Mobility to "unload, help unload and store" Mobility's product. The agreement to unload was not merely incidental to the provisions for a place of storage; clearly, its purpose was to assure that the truck driver delivering the Mobility product would have assistance in unloading the heavy equipment by someone at the place of delivery. Correspondingly, Fleming had agreed to pay Halligan additional compensation to assist with the unloading of Mobility's equipment. The evidence showed that when an unloading process became protracted, Halligan was paid by the hour instead of the usual "flat fee" for a routine unloading. Manifestly, when Halligan arrived at Moose's premises, both had definitive contractual obligations to unload Mobility equipment.

This case is controlled by *Bosher, supra.* There a general contractor was required to construct a concrete floor on a six-inch sand base. Under contract with the general contractor, the supplier of sand was obligated to deliver the sand to the job site, dump it, and spread it as directed by the general contractor. While the driver who delivered the sand was engaged in the spreading operation, the truck he was operating struck and injured the plaintiff, an employee of the general contractor. This Court held that because the truck driver was engaged in the business of the general contractor, the plaintiff's common-law action against the driver's employer was barred.

Conversely, in *Burroughs, supra,* relied on by plaintiff and Mobility, this Court permitted prosecution of a common-law action brought by a plaintiff-deliveryman, injured while engaged in delivery of sheetrock in specified quantities to particular rooms of homes under construction. The Court held the plaintiff was not engaged in the trade, business or occupation of the defendant general contractor because he did not participate in the construction of the homes, but was merely engaged in the final act of delivery. This case, we said, was distinguishable from *Bosher* in which the truck driver both delivered the sand and participated in laying the sand base.

Similarly, in *Hipp* v. *Sadler Materials Corp.*, 211 Va. 710, 180 S.E.2d 501 (1971), also cited by plaintiff and Mobility, we held the Act did not bar plaintiff's action at law. But there, an employee of defendant, which had agreed to furnish and pour concrete at a job site, struck and injured plaintiff while plaintiff was working for another subcontractor at the site. Defendant's employee, required to pour the concrete of specified strength into forms and footings as directed by the concrete finishing subcontractor, was not obligated to spread or finish the material. In that case, the Court held that defendant's employee was performing the final act of delivery, not an act of construction constituting the trade, business or occupation of the general contractor.

The analysis of the preceding cases, considered with the evidence in the present case, demonstrates that Halligan, at the time of his death, was engaged in one aspect of the normal and ordinary business of Moose's, which was to unload Mobility Big Dippers. Plaintiff's decedent had become involved in an essential part of Moose's business and was not merely performing an act which was tangentially related to Moose's other activities of dealing in used farm vehicles and parts.

For these reasons, we think the trial court correctly sustained the special plea. Thus, the judgment of dismissal will be

*Affirmed.*