**Michelle RICE, Plaintiff,**

v.

**VVP AMERICA, INC., t/a Binswanger Glass Co., Defendant.**

**No. Civ.A. 2:00CV701.**

United States District Court,
E.D. Virginia,
Norfolk Division.

April 9, 2001.

Edward F. Halloran, Va. Beach, VA, plaintiff.

S. Lawrence Dumville, Va. Beach, VA, defendant.

## OPINION AND ORDER

DOUMAR, District Judge.

Presently before the Court is Defendant's Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set forth below, Defendant's Motion for Summary Judgment is **DENIED**.

### I. *Factual and Procedural Background*

Prior to the incident that is the subject of this suit, Plaintiff Michelle Rice ("Rice"), was the sole manager and operator of Mel Auto Supply ("MAS"), an automobile supply warehousing business. *See* Pl.'s Answer to Def.'s Interrogs. ¶ 4; Rice Dep. at 7. MAS primarily engaged in supplying local body shops, glass shops, gas stations, automotive hardware shops, and

dealerships with automotive hardware necessary for the completion of body work and glass installation in vehicles. *See id.;* Rice Dep. at 14. One specific product line that MAS provided to its customers consisted of many types of clips and fasteners, which were used to install automotive windshields. *See* Rice Dep. at 14–15. For approximately ten (10) years, Rice, in her capacity as employee and then manager of MAS, supplied such products to Defendant, VVP America, Inc., which trades as Binswanger Glass Co. ("Binswanger"). *See* Pl.'s Answer to Def.'s Interrogs. ¶ 6. Binswanger is a glass seller and distributor and also installs glass in automobiles.

As background information, for the two (2) years prior to the incident that is the subject of this suit, Rice personally visited Binswanger approximately once a month to both take orders and deliver products. *See* Rice Dep. at 17. When she delivered products, she would enter through Binswanger's front door, *see id.* at 19–20, and then either drop the delivery off at the front desk or take the products to the rear service area of the store. *See id.; see also* Pl.'s Answer to Def.'s Interrogs. ¶ 6. In her deposition, Rice states that she "normally" left the delivery at the front desk and did not "go and put the stock up," however, in her answers to Binswanger's interrogatories, Rice states that the "typical place" where she delivered products was the rear of Binswanger's store. *See* Rice Dep. at 20; Pl.'s Answer to Def.'s Interrogs. ¶ 6.

The rear of Binswanger's store consists of an automobile service area where Binswanger employees install automobile windshields for Binswanger customers. Binswanger contends that only its employees are permitted in the rear service area and that only its employees bring customers' vehicles into the service area to have windshields replaced. However, it appears that Rice, by custom, was allowed to enter this service area. In fact, Rice maintains that no Binswanger employee ever told her not to enter the store's rear service area. *See* Rice Dep. at 23–24.

When she delivered products to the rear of the store, "the [Binswanger] workers accepted the merchandise" from her after "she carried [it] from her vehicle." *See* Pl.'s Answer to Def.'s Interrogs. ¶ 6. Rice also states that "[a]s was the custom," she "often assisted in unpacking the items, separating them and putting them in certain bins." *Id.* However, Rice states that she engaged in this activity only on "some occasions," which she quantifies as less than once a month. *See* Rice Dep. at 21, 24. In fact, MAS had supplied Binswanger with these bins for the purpose of storing supplies and parts. *See* Powell Aff. ¶ 4. Also when Rice delivered products to Binswanger, she would take orders for other items that were low in the bins at the glass shop. *See* Rice Dep. at 21. In determining which items were "low," Rice would sometimes help Binswanger employees take inventory of the bins. *See id.* Rice "very seldom" took orders from Binswanger over the telephone. *See id.* at 17.

Chris Powell ("Powell"), a Binswanger employee, states that Rice was Binswanger's only vendor who personally visited the Binswanger store to take orders and deliver products. *See* Powell Dep. at 5. Binswanger's other suppliers of automotive parts, referred to as "catalog suppliers," took orders from Binswanger over the telephone or by facsimile transmission, and deliveries would normally arrive via UPS or other common carrier. *See* Powell Aff. ¶ 7. Upon receipt of a delivery from a catalog supplier, Binswanger's warehouse supervisor would accept the packaged products, inventory them, and then take the delivery to the proper department. *See* Powell Dep. at 32; Powell Aff. ¶ 7. If the delivery was specifically for the auto

glass department, Powell would open, sort, and stock the delivery himself. *See* Powell Dep. at 32. Powell states that "[l]ess than 10 percent of the items purchased in 1998 are believed to have been from [MAS] and would have been sorted and stocked by [Rice]." Powell Aff. ¶ 8.

The facts surrounding the specific incident alleged in Rice's Complaint are as follows. On September 24, 1998, Rice went to Binswanger to deliver some "clips" that Binswanger had previously ordered. *See* Rice Dep. at 18–19. On this particular day, Rice initially brought the delivery to the front of Binswanger's store and a Binswanger employee, identified as Patty, signed for it. *See id.* at 18. Instead of leaving the delivery at the front desk, however, Rice states in her deposition that "Chris [Powell] needed something" and as a result, she personally took the delivery to the rear service area of the store. *Id.* at 20. In the back of the store, Rice assisted in "helping Chris [Powell]" unpack and sort the products, and also place them in certain bins. *See id.* at 20–21. Rice also remembers looking through Binswanger's storage bins with Powell on that day to determine which products Binswanger needed to reorder from MAS, her business. *See id.* at 21. Based on this joint inventory, Rice and Powell formulated a list of items that needed to be ordered. *See id.*

Rice indicates in her deposition that Powell also informed her on that day that he needed a "new item." *Id.* at 22. Powell unequivocally states that Rice left the store to retrieve a product parts catalog from her vehicle in order to assist him in placing this new product order. *See* Powell Dep. at 9. Although Rice also "believes that [she] went to go get new pages [from a parts catalog]," she admits that she is "not positive." Rice Dep. at 23. Later in her deposition, Rice states that she does not remember whether she went out to her car to get "update sheets," but that she "might have." *Id.* at 27.

When she returned to the store, Rice and Powell decided to look at the catalog on a workbench in the rear service area of the store. *See id.;* Powell Dep. at 14. Again, according to Binswanger, only its employees were authorized to be in this area. A customer's automobile was parked directly in front of the workbench, however, making it difficult for the two to view the catalog on the workbench. *See* Powell Dep. at 14–15. Powell maintains that the customer's vehicle was within twelve (12) inches of the workbench, *see id.* at 15, and although Rice is unsure about the distance between the vehicle and the workbench, she maintains that the vehicle was more than twelve (12) inches and potentially as much as three (3) feet away from the workbench. *See* Rice Dep. at 29–30. As a result, Powell decided to move the vehicle back to give them more room to stand at the workbench. *See* Powell Dep. at 15. At the time Powell moved the vehicle, Rice was standing between the front bumper of the vehicle and the workbench. *See id.* at 15. The vehicle was a manual shift, and instead of putting the vehicle into reverse, Powell placed it into fourth or fifth gear. *See id.* at 18. When Powell released the clutch, the vehicle rolled forward, instead of backward, and then stalled, pinning Rice to the workbench. *See id.* at 19. Rice states that prior to the accident, she was not aware that Powell was trying to move the vehicle, but when he did, she "heard the wheels squeal." *See* Rice Dep. at 29. Rice alleges that she suffered serious and permanent injury as a result of this incident. *See* Compl. at ¶ 5. Rice did not file for an award of worker's compensation for her injury. *See* Rice Dep. at 43.

Rice filed her Complaint against Binswanger in this Court on September 19,

2000.[1] In her Complaint, Rice alleges that Binswanger was negligent for a variety of reasons. Specifically, Rice contends that Binswanger (1) failed to keep and maintain its business premises in a reasonable state of repair and free from any unreasonable dangers; (2) failed to warn Rice of any dangers; (3) failed to take reasonable steps and precautions to eliminate any dangers; and (4) failed to act toward Rice in a reasonable and safe manner to assure her safety and well being. *See* Compl. ¶ 6. Additionally, Rice argues that Binswanger was negligent in inviting her into the rear auto bay area of the store and also for hiring an "incompetent, reckless employee," and failing to supervise him. *Id.* Rice also maintains that Binswanger negligently entrusted the vehicle to its employee and that the employee operated the vehicle "carelessly, recklessly and negligently and with gross and wanton negligence." *Id.* ¶ 7. Rice argues that as a direct and proximate result of Binswanger's negligence, she sustained serious and permanent injuries. *See id.* ¶ 9. Further, Rice states that she "has been prevented from transacting normal businesses and activities of life, has suffered and will continue to suffer scarring, disfigurement, permanent disability and inability to attend to and enjoy the normal experiences in life, has suffered inconvenience, and great pain of body and mind, has sustained a loss of earnings and earning capacity, has incurred, and will incur, medical, hospital, doctor, medicine and other bills in an effort to be cured of injuries and control symptoms...." *Id.* ¶ 11. Rice requests an award of one million five hundred thousand dollars ($1,500,-000) in compensatory damages and five hundred thousand dollars ($500,000) in punitive damages. *See id.* ¶ 14.

Binswanger filed its Answer on October 23, 200 0. In its Answer, Binswanger asserted that Rice was a trespasser at the time of the accident, having "exceeded the scope of her invitation by entering the service bay area" of the store. Answer ¶ 5. In addition to generally denying its negligence, Binswanger also set forth a host of affirmative defenses, including (1) failure to state a cause of action for an award of punitive damages; (2) contributory negligence; (3) assumption of the risk; (4) that Rice's cause of action was barred by the exclusivity provisions of the Virginia Workers' Compensation Act; and (5) that Rice was a trespasser or "at best a bare licensee." *Id.* ¶¶ 14–18.

Binswanger filed a Motion for Summary Judgment on February 20, 2001. In support of this motion, Binswanger argues that it was Rice's statutory employer at the time of the accident and therefore, that her cause of action is barred by the exclusivity provision of the Virginia Worker's Compensation Act.

## II. *Legal Analysis*

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories ... show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which

---

**1.** Jurisdiction is invoked pursuant to 28 U.S.C. § 1332, as the amount of damages sought by Rice exceeds $75,000 and complete diversity of citizenship exists among the parties to this action.

that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court explained that, "[i]n such situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v. Lee*, 943 F.2d 366, 368 (4th Cir.1991).

## B. Virginia Workers' Compensation Act

■ The Virginia Workers' Compensation Act ("VWCA" or "the Act") precludes an employee from bringing an action in negligence against his employer for an injury sustained during the course of his employment. *See* Va.Code Ann. § 65.2–307 (West 1995 & Supp.2000). The Act also bars a personal injury action against a party, who is not the plaintiff's employer, if that party is deemed to be the plaintiff's "statutory employer." *See Hayden v. The Kroger Co.*, 17 F.3d 74, 76 (4th Cir.1994) (citing Va.Code Ann. § 65.2–307 and *Best v. Washington Metro. Area Transit Auth.*, 822 F.2d 1198, 1200 (D.C.Cir.1987)). Following this, the VWCA provides the exclusive remedy for an employee who is injured during the course of employment by a fellow employee. *See Feitig v. Chalkley*, 185 Va. 96, 102, 38 S.E.2d 73, 75–76 (1946). The exclusivity provision of § 65.2–307 does not apply, however, to a common law action for an employee's injury or death against an "oth-

er party." *Id.* § 65.2–309. Whether a person or entity is a statutory employer is a jurisdictional matter presenting a mixed question of law and fact that must be resolved in light of the facts and circumstances of each case. *See Cooke v. Skyline Swannanoa, Inc.*, 226 Va. 154, 156, 307 S.E.2d 246, 247 (1983).

Section 65.2–302 of the VWCA delineates the criteria for determining whether a party should be considered a plaintiff's statutory employer. That section provides, in relevant part:

> [w]hen any person (referred to in this section as "owner") undertakes to perform or execute any work which is apart of his trade, business or occupation and contracts with any other person (referred to in this section as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any worker employed in the work any compensation under this title which he would have been liable to pay if the worker had been immediately employed by him.

Va.Code Ann. § 65.2–302(A) (West 1995 & Supp.2000). Thus, according to the Act, contractors, subcontractors, and all workers who are engaged in the trade, business, or occupation of the owner of a project are deemed to be that owner's statutory employees. The Virginia Supreme Court has further clarified the statute by holding that an activity is part of the trade, business, or occupation of the owner if the activity "is, in that business, normally carried on through employees rather than independent contractors." *Shell Oil Co. v. Leftwich*, 212 Va. 715, 722, 187 S.E.2d 162, 167 (1972).

Thus, the ultimate issue with which this Court is faced is whether, at the time of the accident, Rice was performing work

that was part of Binswanger's trade, business, or occupation. If so, Rice is Binswanger's statutory employee and her sole remedy lies under the VWCA. If not, Binswanger is an "other party" subject to Rice's common law negligence action. Although the resolution of whether Rice was Binswanger's statutory employee at the time of the accident hinges essentially on a factual determination, the material facts of the instant case are not in dispute.

In support of its Motion for Summary Judgment, Binswanger argues that Rice was a statutory employee of Binswanger because she "stepped beyond the role of a mere delivery person and was actively engaged in the trade and/or business of [Binswanger]." Def.'s Reply Br. at 4. Binswanger argues that its employees normally perform the work of sorting and stocking supplies. *See* Powell Aff. ¶ 8. Unlike other suppliers who delivered goods via UPS or other common carrier, Rice personally delivered parts to Binswanger and helped to sort and stock these deliveries. *See id.* ¶ 5. In fact, Powell's testimony is that Binswanger employees sorted and stocked approximately 90 percent of the auto parts that were delivered and Rice stocked less than 10 percent of the parts. *See id.* ¶ 8. Further, Binswanger contends that Rice was its statutory employee because she was also assisting Powell in placing an order for a part that was needed in Binswanger's business at the time of the accident. *See id.* ¶ 9. In opposition, Rice contends that she was merely a supplier and deliverer of goods to Binswanger and therefore, not its statutory employee. *See* Pl.'s Resp.Br. at 4. In further support of her position, Rice argues that at the time of the accident, she was not sorting or unpacking the product delivery, but looking at a parts catalog to assist a Binswanger employee with ordering anew product to benefit her own business. *See id.* Binswanger maintains that Rice was in an area of the store only available to its employees. Rice maintains that she was invited into the area.

## C. Case Law Interpreting the VWCA

Binswanger relies primarily on a few Virginia and Fourth Circuit cases to support its argument that Rice is a statutory employee of Binswanger. In one such case, *Fowler v. International Cleaning Service, Inc.*, 537 S.E.2d 312 (Va.2000), the plaintiff ("Fowler") slipped on a tile floor in the store of her employer ("Sears"), after the floor had been mopped by an employee of the defendant ("International"). *See id.* at 313. Fowler claimed that International, a business that was under contract to provide cleaning and janitorial services to Sears, negligently failed to place signs or otherwise warn of the dangerous condition that existed. *See id.* In response, International asserted that Fowler's exclusive remedy was the VWCA and that her action against it was barred by the Act's exclusivity provision. *See id.*

In resolving whether International was an "other party" under § 65.2–309, the Virginia Supreme Court stressed that the "combined efforts of International and Sears were designed to accomplish Sears' goal of making its store clean, attractive, and safe—a goal necessary to the successful operation of Sears' furniture business." *Id.* at 316. The court found the existence of such "combined efforts" because Sears' employees were expected to wipe up anything they spilled, sweep the concrete floor of the store's warehouse once a week, and routinely carry trash to a dumpster located on the store's premises. *See id.* at 313. Sears' employees also had access to International's janitorial closet and they used International's equipment and cleaning supplies. *See id.* By participating in these "combined efforts," the court held that International was "performing an es-

sential part" of Sears' business. *See id.* As such, the court concluded that International was a statutory employee of Sears and Fowler's action therefore was barred by the VWCA. *See id.*

Based on *Fowler,* Binswanger argues that its employee, Powell, and MAS's employee, Rice, were likewise engaged in such "combined efforts" because they both performed the business of Binswanger. Specifically, Binswanger contends that both Rice and Powell engaged in sorting parts, stocking parts, taking inventory of parts, and preparing parts orders. Binswanger maintains that such actions are an essential part of Binswanger's automotive glass repair business.

It cannot be denied that by participating in such "combined efforts," such as sorting parts, stocking parts, and taking inventory of parts, Rice was performing an essential part of Binswanger's business. However, *Fowler* provides no guidance as to whether Rice's activity in looking at her own business's product catalog, in order to assist a Binswanger employee in placing a parts order on behalf of Binswanger, also constitutes a part of Binswanger's trade, business, or occupation. Indeed, Binswanger places orders for parts in the course of its business. However, Rice, in her capacity as sole manager and operator of MAS, provides parts catalogs to her customers, one of which is Binswanger, takes orders for products contained within the catalog, and also assists her customers in this process. In fact, these activities are an essential part of MAS's business. Thus, although the Virginia Supreme Court's analysis in *Fowler* is instructive, it is by no means dispositive of the instant case.

Moreover, *Fowler* may be further distinguished from the case at bar. In *Fowler,* the purpose of International's presence at Sears was to beautify the store through its provision of janitorial services. International worked twice a week, two to three hours per day, to effect this purpose. *See id.* For three years prior to the date of the accident, International had been under contract to provide such janitorial services to Sears. *See id.* In contrast, in the instant case, Rice personally visited Binswanger approximately once a month to deliver products and to take additional product orders. *See* Rice Dep. at 24. Less frequently than once a month, Rice assisted Binswanger employees in unpacking her product deliveries and sorting them into the storage bins. *See id.* Additionally, Rice was not under contract to perform these services. She provided Binswanger with personal service that other Binswanger suppliers could not or did not provide in order to maintain her business relationship with Binswanger. Thus, Rice's involvement in Binswanger's business may be distinguished from that of the parties in *Fowler.*

The next two cases on which Binswanger relies, both of which deal with the act of delivering goods, more closely approximate the true issue involved in the instant case. The first such case on which Binswanger relies is *Conlin v. Turner's Express, Inc.,* 229 Va. 557, 331 S.E.2d 453 (1985), which involved a suit brought by Conlin, an employee of Ford Motor Company ("Ford"), against Turner's Express, Inc. ("Turner's"), a common carrier hired by Ford to transport Ford parts and machinery from one assembly plant to another. *See id.* at 558, 331 S.E.2d at 454. Under the agreement between the two companies, Ford was obligated to load the cargo and to unload it at its destination. *See id.* at 558, 331 S.E.2d at 455. Conlin was injured while operating a forklift used to load Ford machinery and parts onto Turner's trailer. *See id.* at 558, 331 S.E.2d at 454. While the forklift was on the trailer's floor, the floor collapsed, which caused the forklift and Conlin to fall. *See*

*id.* Conlin received workers' compensation from Ford and then sought to sue Turner's to recover personal injuries that Conlin alleged were caused by Turner's negligence. *See id.*

The court found that "transporting machinery and parts from one plant to another was an essential element of Ford's business." *See id.* at 559, 331 S.E.2d at 455. In so holding, the court recognized that "one who merely delivers his materials is not engaged in the trade, business, or occupation of [the other business] and, therefore, is an 'other party' subject to suit." *Id.* at 560, 331 S.E.2d 453, 331 S.E.2d at 455–56. However, the court distinguished the facts of *Conlin* from a mere "delivery" case and held instead that Turner's was in fact engaged in Ford's trade, business, or occupation at the time of the accident. *See id.* at 560, 331 S.E.2d 453, 331 S.E.2d at 456. Specifically, the court held that Turner's was "not merely delivering merchandise to a job site but was transporting cargo between Ford's assembly plants, an essential part of Ford's business." *Id.* As a result, the court held that Turner's was not an "other party" whom Conlin could sue. *See id.*

The second "delivery" case upon which Binswanger primarily relies is the Fourth Circuit's opinion in *Hayden v. The Kroger Company,* 17 F.3d 74 (4th Cir.1994). In *Hayden,* the plaintiff was an independent owner and operator of a truck used for the long-haul transfer of goods. *See id.* at 75. Hayden was hired by Universal Am Can to haul a load of canned goods from Kansas to a distribution center owned by Kroger in Virginia. *See id.* The evidence in the case was as follows. Kroger, a retail grocery business, operated a distribution center in Virginia that received goods, stored them, and then reshipped the items to Kroger stores throughout the region. *See id.* Independent trucking contractors delivered 80% of the goods to the Kroger

distribution center and Kroger employees, operating Kroger trucks, delivered the remaining 20% of all goods to the facility. *See id.* Kroger drivers followed the same standard operating procedures as the independent truck drivers when they unloaded trucks at the Kroger distribution facility. *See id.* Upon arrival at the Kroger distribution center, an independent truck driver could either unload the truck himself, hire an independent contractor to unload the truck, or hire Kroger to unload the truck. *See id.*

When Hayden arrived at the Kroger distribution center on the day of the accident, Kroger personnel instructed him how to unload his cargo and where to stack the goods, in accordance with Kroger standard procedure. *See id.* Hayden chose to unload the truck by himself. *See id.* As Hayden was unloading the goods, he slipped and fell on the wet floor, which had just been cleaned by a floor sweeper. *See id.* Similar to the instant case, the issue presented in *Hayden* was whether Hayden was Kroger's statutory employee at the time of the accident.

Kroger argued that Hayden was its statutory employee because he had been performing an element of Kroger's business when he unloaded the goods from his truck into the distribution center. *See id.* at 76. In opposition, Hayden argued that he was not engaged in any form of Kroger's business when he unloaded the cargo from his truck. *See id.* Further, Hayden argued that the unloading of trucks at the distribution center was not a function normally performed by Kroger employees because they only performed this function 20% of the time. *See id.* In resolving the issue, the Fourth Circuit, relying on *Conlin,* held that "the transportation, loading and unloading of canned goods is an essential function of Kroger's business." *Id.* at 77. As such, the appellate court determined

that Hayden was not simply a delivery person, but that he "became Kroger's statutory employee when he performed those duties [of transporting, loading and unloading canned goods] at the time of his injury." *Id.*

Based on *Conlin* and *Hayden*, therefore, Binswanger argues that Rice was not merely delivering goods at the time the accident occurred, but was instead engaged in the trade, business, or occupation of Binswanger. Binswanger relies on the fact that Rice regularly made deliveries to Binswanger and, with the assistance of Binswanger employees, sorted the items delivered and placed them in storage bins for the convenience and use of Binswanger. Binswanger stresses that Rice was the only sales representative with whom it dealt who regularly performed these services at Binswanger. In fact, Binswanger, by its own employees, performed the identical services when deliveries arrived via UPS or other common carrier from other suppliers. Moreover, Binswanger maintains that, at the time of the accident, Rice was in an area of the store where only Binswanger employees were allowed. In short, Binswanger argues that Rice "stepped beyond the role of a mere delivery person" and instead was "actively engaged in the trade and/or business of [Binswanger]" because she worked "in tandem" with Powell, a Binswanger employee, in performing such duties in an area where only Binswanger employees were permitted. For all of these reasons, Binswanger contends that Rice was its statutory employee at the time of the incident that is the subject of Rice's action and that her exclusive remedy is under the VWCA.

In opposition, Rice relies on different case law to support her argument that she was not engaged in Binswanger's trade, business, or occupation at the time of the incident in question. Specifically, Rice

stresses that the proper focus is on what she was doing at the precise time she was injured. At the particular time of her injury, she was looking in her business's catalog to assist Powell in placing an order for Binswanger. She was not engaged in unloading or sorting the product delivery or assisting in taking inventory of products that may need to be replaced, although she admits that she did engage in such activities on that day. Based on this rationale, Rice maintains that at the precise time of her injury, she was not engaged in an activity within the field of Binswanger's particular trade, business, or occupation.

In support of her position, Rice cites to a different line of "delivery" cases, including *Burroughs v. Walmont*, 210 Va. 98, 168 S.E.2d 107 (1969). In *Burroughs*, the defendant, a general contractor for the construction of homes, purchased sheetrock from Cherrydale Cement Block Company ("Cherrydale"), a supplier of sheetrock. *See id.* at 98, 168 S.E.2d at 108. Plaintiff was an employee of the trucking company that delivered the sheetrock for Cherrydale. *See id.* at 99, 168 S.E.2d at 108. As part of the purchase contract, the plaintiff was to carry the sheet rock to specific rooms in the house. *See id.* at 98, 168 S.E.2d at 108. While the plaintiff was carrying the sheetrock into the home, he fell down an open stairwell and sustained numerous injuries. *See id.* at 99, 168 S.E.2d at 108. The court recognized that a supplier or deliverer of materials or items is in some way almost always involved in the purchaser's trade, occupation, or business. *See id.* at 99–100, 168 S.E.2d at 108. However, the court explained that "a line must be drawn to determine who is an 'other party' for the purposes of the Workers' Compensation Act. And persons who function solely as suppliers and deliverers of goods have been held 'other parties.'" *Id.* at 100, 168 S.E.2d at 108. In *Burroughs*, the court determined that the

stacking of sheetrock in the specific rooms constituted the final act of delivery and not construction. *See id.* As such, the plaintiff's case was not dismissed. *See id.,* 168 S.E.2d at 109.

Rice erroneously relies on *Burroughs* for the proposition that because she gratuitously assisted Binswanger's employees in the unloading of her deliveries, she may not be considered Binswanger's statutory employee. In *Burroughs,* however, both the delivery and the carrying of the sheetrock to specified rooms was included in the purchase contract. This is not the situation in the case at bar as there is no evidence that Rice's sorting, stocking, and taking inventory of parts was part of the purchase contract between her business and Binswanger. However, *Burroughs* does support Rice's argument in that Virginia courts consistently maintain that individuals who function solely as suppliers and deliverers of goods are not statutory employees of the business to which they are delivering goods.

Rice also cites to *Buffalo Shook Company v. Barksdale,* 206 Va. 45, 141 S.E.2d 738 (1965), in support of her position. In *Barksdale,* the plaintiff was a truck driver employed by a sawmill operator. *See id.* at 46, 141 S.E.2d at 740. The defendant was engaged in manufacturing tobacco hogsheads and pallets from lumber purchased from plaintiff's employer. *See id.* The plaintiff drove a truck loaded with lumber sold by his employer to the defendant's business site. *See id.* When he arrived at the defendant's business, one of the defendant's employees, operating the defendant's forklift, began to lift the lumber off of the truck. *See id.* It was the duty of the defendant to unload the lumber from the truck. *See id.* The plaintiff took the chain off of the load of lumber and the forklift operator then proceeded to unload one side of the truck. *See id.* at 46–47, 141 S.E.2d at 740. Plaintiff then moved his

truck so the forklift could unload the other side. *See id.* at 47, 141 S.E.2d at 740. The forklift operator encountered difficulty in lifting the lumber and as a result, he directed the plaintiff and another man to get on the forklift. *See id.* The lift operator then "renewed his efforts, 'made a couple of quick jerks; and succeeded in moving the load clear of the truck, but when he did so the front end of the lift went down and the rear flew up, carrying the plaintiff with it.'" *Id.* The plaintiff was seriously injured as a result. *See id.*

In holding that the defendant was an "other party" against whom the VWCA reserved a right of action for damages, the Virginia Supreme Court stressed that the plaintiff was not employed by the defendant, he received no compensation from the defendant, and was subject to no control by the defendant. *See id.,* 141 S.E.2d at 740–41. Moreover, the court stressed that the plaintiff was not required by his employer to assist in unloading the lumber and owed no duty to the defendant to give such assistance. *See id.,* 141 S.E.2d at 741. Further, the court recognized that it "was customary ... for the driver of the truck to give a hand in unloading it...." *Id.* It was "not part of the trade, business or occupation" of plaintiff's employer to help unload the truck and defendants "did not thereby become engaged in the business of [the plaintiff's employer], but were clearly 'other parties,' strangers to the business of [plaintiff's employer]." *Id.* at 48, 141 S.E.2d at 741. As such, the court held that the plaintiff could maintain a tort action against the defendant. *See id.*

In reliance on the above case law, Rice argues that she was under no obligation, responsibility, or duty to unpack and sort parts for Binswanger or help its employees use her catalog. Instead, she did so as a courtesy to promote her business's good will. Although Rice assisted Binswanger

employees "on occasion" in filling out orders for supplies and parts, she argues that this was not the normal practice as Binswanger employees would normally select parts on their own from catalogs.

## D. Application

At oral argument, Binswanger argued that the Court should determine whether Rice was its statutory employee by focusing on all of Rice's actions during her visit to Binswanger on the day of the accident. Based on the relevant case law, however, the Court is of the opinion that the proper focus is on Rice's activity at the precise time of the accident. *See Hayden,* 17 F.3d at 77 (concluding that the plaintiff became the defendant's statutory employee when he performed essential duties of the defendant's business "at the time of his injury"); *Stevens v. Ford Motor Co.,* 226 Va. 415, 419, 309 S.E.2d 319, 322 (1983) (stating that the defendant is an "other party" if "at the time of the accident, plaintiff and his employer were not performing work that was part of defendant's trade, business or occupation"); *Stout v. Onorati,* 221 Va. 143, 147–48, 267 S.E.2d 154, 157 (1980) (stating that defendants "were 'other parties' if at the time of the accident, [the deceased] was not performing work that was part of [defendant's] trade, business or occupation"); *Burroughs,* 210 Va. at 99, 168 S.E.2d at 108 (stating that the defendant was an "other party" if "at the time of the accident," the plaintiff was not performing work that was part of the defendant's trade, business or occupation). At the time of the accident, Rice was standing in front of a workbench in the service area of Binswanger's store, looking at her business's product catalog or "update sheets," in order to find a new part that Powell was interested in ordering from Rice on behalf of Binswanger. Therefore, the true issue is whether Rice, who was in Binswanger's rear automobile service area at the time of the accident—

an area generally exclusive to Binswanger employees—was engaged in Binswanger's trade, business, or occupation by being where she was and looking in her parts catalog in order to assist a Binswanger employee in placing an order for the Binswanger store. The Court concludes that she was not.

There is no question that had Rice been injured while she was engaged in the unpacking, sorting, and stocking of the delivery at the time of the accident, she would be considered a statutory employee of Binswanger. This is because the unpacking, sorting, and stocking of deliveries is an essential part of Binswanger's business that was normally performed by Binswanger employees. Additionally, had Rice merely dropped the delivery off at Binswanger's front desk and taken an order from her business's product catalog at the front desk, she would not be considered Binswanger's statutory employee. Neither of these situations, however, address the precise issue before this Court.

The testimony before the Court is that, on the day of the accident, Rice personally took the delivery to the rear service area of Binswanger and assisted Powell in unpacking, sorting, and stocking the products contained within the delivery. *See* Rice Dep. at 20–21. Additionally, Rice and Powell took an inventory of the store's parts to determine which products needed reordering. *See id.* at 21, 168 S.E.2d 107. Powell also informed Rice during this visit that he needed a "new item." *Id.* at 22, 168 S.E.2d 107. Powell's testimony is that Rice then left the store to retrieve a product parts catalog from her vehicle. *See* Powell Dep. at 9. Rice, too, states that she "believes that [she] went to go get new pages [from a parts catalog]," but she admits that she is "not positive." Rice Dep. at 23. After returning to the store, Rice and Powell decided to look at the MAS

catalog or "update sheets" on a workbench in the rear service area of the store, and this is when the accident occurred. *See id.* at 27, 168 S.E.2d 107. The Court finds that the fact that Rice left Binswanger's store, went out to her car to retrieve either a product catalog or "update sheets," and then returned to the store to take an order from Binswanger for a "new item" that MAS carried, makes all of the difference.

When Rice left Binswanger's store to go out to her vehicle and retrieve a MAS product parts catalog or "update sheets," she ceased performing the work of Binswanger. Upon her return to the store, she was acting on behalf of MAS, not Binswanger, in taking a product order. Although helping Powell place an order on behalf of Binswanger for parts to be supplied by MAS may have incidentally benefitted Binswanger, this activity related only to the sale of MAS's products and was therefore insubstantial in the context of Binswanger's general business. Further, Rice's conduct in taking and preparing a parts order for her own business, MAS, was not an activity normally performed by employees of Binswanger. The relationship between Rice and Binswanger at the time of the accident, therefore, was one of vendor and vendee and not "owner" and "subcontractor" as defined in § 65.2–302 of the Virginia Code. Moreover, even if she was in an area exclusive to Binswanger's employees, she was there with Powell's permission or acquiescence. As such, the Court concludes that Rice was not Binswanger's statutory employee at the time of the accident. Accordingly, Rice's common law negligence action against Binswanger is not barred by the exclusivity provision of the VWCA because Binswanger is an "other party" against whom the Act reserves a right of action for damages.

### III. *Conclusion*

For the reasons set forth above, Binswanger's Motion for Summary Judgment is **DENIED.** The Court finds that Binswanger has not established that it is entitled to judgment as a matter of law.

The Clerk of the Court is **DIRECTED** to mail a copy of this Opinion & Order to all counsel of record.

**IT IS SO ORDERED.**